**W. Brent GILL and Marina Gill, Appellants (Defendants and Cross–Claimants below),**

v.

**Fred POLLERT and Pollerts' Inc., Appellee and Cross–Appellee (Defendant and Cross–Defendant below),**

**Onyx Paving Company, Inc., Appellee and Cross–Appellant(Plaintiff below),**

**Penn–America Insurance Co., Appellee (Defendant and Cross–Defendant below),**

and

**GAB Robins North America, Inc., Appellee (Defendant below).**

No. 36S01–0304–CV–163.

Supreme Court of Indiana.

June 30, 2004.

David W. Stone IV, Stone Law Office & Legal Research, Anderson, IN, Patrick W. Harrison, Harrison & Dalmbert, Columbus, IN, Attorneys for W. Brent Gill and Marina Gill.

John A. Stroh, Lisa A. Anderson, Sharpnack Bigley, LLP, Columbus, IN, Attorneys for Onyx Paving Company, Inc.

Keith A. Kinney, Alan J. Irvin, Hill Fulwider McDowell Funk & Matthews, Indianapolis, IN, Attorneys for Fred Pollert and Pollerts' Inc.

Brent Threlkeld, Neal F. Eggeson, Jr., Threlkeld Reynolds, LLP, Indianapolis, IN, Attorneys for Penn–America Ins. Co.

ON PETITION TO TRANSFER FROM THE INDIANA COURT OF APPEALS, NO. 36A01–0203–CV–97.

DICKSON, Justice.

We granted transfer in this case to consider the relation-back of a cross-claim filed timely but where leave of court was not sought and granted until after the expiration of the statute of limitations.

This litigation arises from the aftermath of a fatal fire that destroyed the Centennial Hotel building in Seymour, Indiana, on December 25, 1998. The building was owned by W. Brent and Marina Gill ("the Gills") and insured through a policy issued by Penn–America Insurance Company ("Penn–America") procured through the Gills' insurance agent, Fred Pollert of

Pollerts' Inc. (collectively, "Pollerts"). Immediately after the fire, Onyx Paving Company, Inc. ("Onyx") called Pollerts and expressed interest in providing demolition services for the hotel remnants. Two days later, Pollerts telephoned Onyx and authorized the demolition work to begin. Penn–America's adjuster, GAB Robins North America, Inc. ("GAB"), was not involved in the initial authorization for Onyx to do the demolition work. When Onyx completed the demolition, it prepared its invoice dated January 21, 1999, for $153,800. It read "Bill to: Brent & Marina Gill, F. Pollert/Pollerts' Inc., 404 N. Chestnut, Seymour, IN." This was the address of Pollerts, and Onyx delivered the invoice to Pollerts. Claiming that the Gills' policy provided only limited coverage for "debris removal," Penn–America paid Onyx only $10,000.

Upon failing to receive the balance of the invoice for demolition, Onyx filed a complaint in June of 1999 against Pollert, Pollerts' Inc., Centennial Hotel ("Centennial"), GAB, and Penn–America. In the complaint, Onyx also sought to foreclose on a mechanic's lien for the unpaid balance against the property on which the hotel had been located. The answer filed by Centennial on September 3, 1999, did not assert any cross-claim. Appellants' Appendix at 33–40. On May 9, 2000, however, Centennial filed a cross-claim against Pollerts and Penn–America seeking payment of the hotel demolition costs and asserting other claims. Although the cross-claim was filed with the court and mailed to counsel for Pollerts and Penn–America on May 5, 2000, neither Centennial nor the Gills sought leave of court to file

the cross-claim. On June 16, 2000, Onyx filed an amended complaint substituting the Gills for the defendant Centennial. In their answer filed July 25, 2000, the Gills admitted their ownership of Centennial, but their answer did not include any cross-claims. In October of 2000, the trial court heard and granted a summary judgment motion filed by Penn–America and GAB against Onyx. For over eight months after Centennial filed its cross-claim, neither Pollerts nor Penn–America filed an answer or other response to the cross-claim, despite assurances from counsel for Pollerts that one would soon be filed. The Gills did not seek a default judgment on their cross-claim during this delay. But on January 31, 2001, just over two years after Onyx presented its invoice for the completed demolition, Pollerts filed a motion to dismiss the cross-claim asserting that the Gills had not sought and obtained leave to file it. Two days later Centennial and the Gills filed a motion requesting "that their cross-claim of May 9, 2000, be allowed." Appellants' Appendix at 203. The trial court immediately granted the motion and ordered "that the Cross-claim of May 9, 2000, is authorized and permission is given by the Court for that Cross-claim to be filed." *Id.* at 205. When the Pollerts finally filed their answer to the cross-claim on February 27, 2001, they asserted the statute of limitations among other defenses. On March 12, 2001, Penn–America and GAB (although the Gills' cross-claim did not name GAB as a cross-defendant) jointly responded to the cross-claim with a consolidated motion to dismiss and an answer asserting various defenses including the statute of limitations.[1] They also filed

---

1. The cross-defendants contended that the cross-claim asserts that actions for injury to personal property must be commenced within two years after the cause of action accrues. Ind.Code § 34–11–2–4. In the trial court, the Gills argued that their claims asserting fraud, constructive fraud, material misrepresenta-

tion, and breach of oral contract are covered by the six-year statute of limitations. Ind. Code § 34–11–2–7. Citing *Whitehouse v. Quinn*, 477 N.E.2d 270 (Ind.1985), and *Shideler v. Dwyer*, 275 Ind. 270, 417 N.E.2d 281 (1981), Pollerts responded that the applicable limitations period is governed by the nature,

a motion for summary judgment asserting the two-year statute of limitations and other claims. The statute of limitations was similarly asserted by the Pollerts' motion for summary judgment filed a few days later.

On July 18, 2001, the trial court addressed the pending motions, expressing great concern regarding the "troubling aspects to this case." *Id.* at 387.

It is clear from the comments of counsel that the Cross-defendants knew that the Cross-claim was not correctly filed. It is further clear that they took no action in a conscious stratagem to mouse trap the Cross-claimants with the statute of limitations. The Court believes that discussions among the lawyers involved were held concerning the cross-claim and though the Court does not believe that the attorneys for the Cross-claim defendants explicitly, expressly or specifically lied concerning the filing of some responses to the Cross-claim, the Cross-claimants believed or were allowed to believe that the response would be an admit/deny answer.

There is no question that the allegations of the Cross-claim were known to the Cross-claim defendants before the statute of limitations would have expired. There is no question that a response could have been filed before the statute of limitations would have expired. There is now [sic] question that the Cross-claimants could have forced a response before the statute of limitations would have expired. None of the above occurred.

*Id.* at 387.

Noting "[a]s much as the Court dislikes the practice of law as sport," *id.* at 389, the trial court applied *Sears, Roebuck & Co. v. Boyd,* 562 N.E.2d 458 (Ind.Ct.App.1990), and concluded as a matter of law that the

not the form, of the action. This issue is not

May 9, 2000, cross-claim filed without permission of the court "was a procedural non-entity," Appellants' Appendix at 387, that the subsequent order could not relate back, and that the cross-claim was barred by the statute of limitations. The trial court granted a motion to substitute parties that had been filed by the Gills, but then granted the summary judgment motions filed by Pollerts and by Penn–America and GAB. Thereafter, on March 18, 2002, following a bench trial, the trial court awarded Onyx a judgment against the Gills for $143,800 and $6,000 in attorney's fees, but found against Onyx on its claim against Pollerts. The Gills appealed, and Onyx cross-appealed. The Court of Appeals affirmed in an unpublished memorandum decision.

### 1. Validity of Cross-claim

 The Gills argue that their cross-claim of May 9, 2000, while initially filed without leave of court, nevertheless became valid when explicitly authorized by the trial court order on February 2, 2001, and that the date their cross-claim was filed thus related back to May 9, 2000, when originally filed and served upon the cross-defendants. Pollerts and Penn–America argue (a) that because the Gills' cross-claim was neither filed with their answer nor with court permission, it is a nullity, and (b) that it cannot relate back as an amended pleading.

In *Boyd,* our Court of Appeals held that "a cross-claim must be asserted in an answer," that it "is not a pleading itself," and that a defendant "can assert a cross-claim against a co-defendant by amending his answer only if leave of court is granted pursuant to Ind. Trial Rule 15(A)." 562 N.E.2d at 460. Finding that the record did not reflect any order that allowed Boyd to file the cross-claim, the court held it was a nullity.

presented by the Gills on appeal.

As applied to the present case, Trial Rule 15(A) provides in relevant part that "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave *shall be given when justice so requires.*" (emphasis added.) At all times relevant to the present case, Trial Rule 15(C) provided in relevant part: [2]

Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment:

(1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and

(2) knew or should have known that but for a mistake concerning the identity of the proper party, the action would have been brought against him.

*Id.*

The facts of the present case are distinguishable from those in *Boyd.* Although not filed contemporaneously with the cross-claim, Centennial and the Gills did subsequently file a motion requesting "permission to file" their cross-claim and asking that their cross-claim of May 9, 2000 "be allowed." Appellants' Appendix at 203. The trial court granted the motion, ordering that said cross-claim "is authorized and permission is given by the Court for that cross-claim to be filed." *Id.* at 205. This is unlike *Boyd,* where the court

noted the absence of any order in the record granting leave to file the cross-claim. 562 N.E.2d at 460. We therefore decline to find that the filing of the cross-claim in the present case was a procedural non-entity.

## 2. Relation Back under Trial Rule 15(C)

■ We next turn to whether the cross-claim "relates back to the date of the original pleading." Trial Rule 15(C). We are mindful of the requirement of Trial Rule 8(F) that "[a]ll pleadings shall be so construed as to do substantial justice, lead to disposition on the merits, and avoid litigation of procedural points," and also the language of Trial Rule 15(A) that leave to amend "shall be given when justice so requires." The "original pleading" for purpose of our Rule 15(C) analysis was the Gills' answer of July 25, 2000, to Onyx's amended complaint. This answer admitted and denied various allegations of the complaint that were based on the demolition services performed. The answer expressly averred facts relating to the conduct of Fred Pollert in ordering the demolition work and in assuring the presence of insurance coverage for the work. Appellants' Appendix at 106–12. The cross-claim thus "arose out of the conduct, transaction, or occurrence" referred to in the answer. Trial Rule 15(C).

When a claim asserted in the amended pleading arises out of the allegations of the original pleading (here, the Gills' answer to the amended complaint), Rule 15(C) states that an amendment "changing the party against whom a claim is asserted relates back if ... within the period provided by law for commencing the action against him, the party to be brought in by amendment" satisfies two conditions: timely no-

---

**2.** Trial Rule 15(C) was amended December 21, 2001, effective April 1, 2002, to replace the phrase "within the period provided by law for commencing the action against him" with "within one hundred and twenty (120) days of commencement of the action."

tice of the institution of the action and actual or constructive knowledge of a mistake in identity.[3] The Gills' cross-claim, which was timely served upon the cross-defendants, complies with the first condition, but not the second, because this is not a case of mistaken identity. We note, however, that Rule 15(C) applies these two conditions only as to the party *"to be brought in"* by amendment. In the present case, the cross-defendants named in the cross-claim were not new parties but were already in the case as co-defendants in the complaint brought by Onyx. Because Pollerts and Penn–America were not "brought in" to the case when the Gills' answer was amended to include their cross-claim, relation back of the amended pleading is not limited by the timely notice and mistaken identity conditions of Rule 15(C). We therefore hold that Gills' cross-claim, as an amendment to its July 25, 2001 original answer to the amended complaint, relates back to said date.

Because the cross-claim is thus deemed to have been filed within two years of the accrual of the Gills' alleged causes of action, the grant of summary judgment upon statute of limitations grounds is reversed.

**3. Service of Process for Cross–Claim**

■ Penn–America contends that the cross-claim was invalid as against them in part because it was never properly filed or served. Generally citing *Fifer v. Soretore–Dodds*, 680 N.E.2d 889 (Ind.Ct.App.1997), and *Geiger & Peters, Inc. v. American Fletcher Nat'l. Bank & Trust Co.*, 428 N.E.2d 1279 (Ind.Ct.App.1981), it argues that because a cross-claim asserts a new cause of action, it requires the same filing and service of process as does a new complaint. Neither of these cases, however, directly address whether a cross-claim must be accompanied by separate service of process upon the cross-defendants.

Trial Rule 4(A) states that a court has jurisdiction over a party served with summons or who enters an appearance. Trial Rule 13(G) permits a pleading to "state as a cross-claim any claim by one party against a co-party." This rule does not contain any requirement for new service of process for a cross-claim. Rule 13(H) allows persons other than those to the original action to be made parties to a counterclaim or cross-claim in accordance with Rule 14(A), which provides that a summons and complaint must be served upon a person "not a party to the action." Where, as here, Pollerts and Penn–America were already parties to the action, and were served with copies of the cross-claim when it was filed on May 9, 2000, it was not necessary for the Gills to obtain additional service of process upon them. *See* Stephen E. Arthur and Jerome L. Withered, 21 *Indiana Practice* 102 § 6.02 ("No summons is required for counterclaims or cross-claims against a person who is already a party to the action.").

**4. Effect of Intervening Judgment**

■ Penn–America additionally contends that, aside from the relation-back issue, the cross-claim is not effective as against Penn–America because of the trial court's intervening determinations in separately granting Penn–America's motion for summary judgment against plaintiff Onyx. Penn–America argues that the trial court's express summary judgment findings regarding the relationship of Pollerts to Penn–America constitute res judicata and that issue preclusion thus foreclosed all of the theories presented in the Gills' cross-claim against Penn–America. This issue was raised in the Penn–America/GAB mo-

**3.** The second condition requires that the party to be brought in by amendment "knew or should have known that but for a mistake concerning the identity of the proper party, the action would have been brought against him." Ind. Trial Rule 15(C).

tion for summary judgment, Appellants' Appendix at 245, 254–256, but it was not discussed in the trial court's July 18, 2001, order granting summary judgment to Pollerts and Penn–America on statute of limitations grounds. *Id.* at 386–89. Although raised by Penn–America in its Brief of Appellee, the Court of Appeals did not address the issue because it found dispositive the cross-claim procedural question. We could remand to the trial court for resolution, but elect to address the issue here because it is a pure question of law and requires no determination of fact.

Penn–America and GAB filed their motion for summary judgment on April 12, 2000, seeking summary judgment in the only action then pending against them—the complaint by Onyx. No relief was requested as against Centennial Hotel or the Gills. At that time, the Gills had not yet been formally substituted for Centennial Hotel as party defendants.[4] One month later, on May 9, 2000, Centennial filed its cross-claims against Pollerts and Penn–America, asserting that "[a]ll of the activities that Fred Pollert did in this complaint were not only done individually but as ... an agent of Penn–America Insurance, Inc." Appellants' Appendix at 75; *see also id.* at 79, 80, 82. The cross-claim's allegations against Penn–America were based exclusively upon its alleged agency relationship

with Fred Pollert. On October 23, 2000, the trial court separately granted summary judgment in favor of Penn–America and GAB "as to all issues" raised in plaintiff Onyx's complaint. *Id.* at 170. Among its conclusions of law, the trial court stated: "As a matter of law, Fred Pollert individually and d/b/a Pollerts, Inc. was not a broker, special agent, or general agent for Penn–America Insurance company and/or GAB Robins North America, Inc." *Id.* In subsequently seeking summary judgment against the Gills, and in this appeal, Penn–America asserts that the October 2000 judgment is also determinative as to the Gills' cross-claim against Penn–America.

Under the doctrine of res judicata, "a judgment rendered on the merits is an absolute bar to a subsequent action between the same parties or those in privity with them on the same claim or demand." *Sullivan v. American Cas. Co.,* 605 N.E.2d 134, 137 (Ind.1992). Res judicata does not apply here because the October 2000 judgment is not between the same parties on the same claim. *Id.* The Gills are not the same as, or in privity with, Onyx as to Onyx's claim that Penn–America was liable for the acts of Pollerts as its agent, which issue was determined by the October 2000 summary judgment.[5]

---

4. On March 14, 2001, Centennial moved to substitute the Gills as party defendants to the Onyx complaint and as cross-defendants on the May 2000 cross-claim, which motion was granted on July 18, 2001. Throughout most of the proceedings, the same attorney, Patrick W. Harrison has represented both Centennial Hotel and the Gills. While he did not formally enter his appearance until July 21, 2000, Harrison first appears in the record as attorney for Centennial with the September 1999 filing of its answer to the initial Onyx complaint.

5. Although no claim for application of the doctrine of collateral estoppel is presented in

this case, we note that collateral estoppel may be invoked *by* a party who was not a party to the initial proceeding. But it is not true that it may be invoked *against* a party who was not a party to the initial proceeding. Indeed, it is a denial of due process to do so. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 327–28, & n. 7, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). In this case the Gills had no relationship to Onyx, and no obligation to respond to Penn–American's motion for summary judgment against Onyx. It is true, of course, that the prior ruling might well be stare decisis, if there are no facts beyond whatever Onyx produced to show an agency relationship between Pollerts and Penn–America.

We conclude that the issues determined in the trial court's grant of Penn–America's motion for summary judgment against Onyx are not *res judicata* as to the Gills' cross-claim against Penn–America. For this reason, and because we have determined that the cross-claim is deemed to have been filed within two years of the accrual of the Gills' alleged causes of action, and because it does not fail for failure of service, we reverse the summary judgment obtained by Penn–American against the Gills.

### 5. Mechanic's Lien

Apart from their appellate challenge to the summary judgment granted against them on their cross-claim, the Gills also appeal the judgment following a bench trial "that Plaintiff have and recover of and from the Defendant's [sic] the sum of $143,800.00, plus interest ... together with the costs of this action and attorney fees of $6,000.00." Appellants' Appendix at 514. The Gills argue that the trial court's judgment should be reversed because Onyx did not comply with the statutory requirement to provide duplicate copies of the notice and because the Gills did not give the active consent to Onyx's work required to establish a mechanic's lien. In response, Onyx contends that it did properly file the mechanic's lien and that, even if it did not, the Gills failed to argue otherwise at trial and thus their argument is waived. Onyx also argues that the Gills did actively consent to the work or, alternatively, that Fred Pollert, acting as their agent, actively consented to it.

■ Upon review, this Court does not reweigh the evidence but only considers the evidence in the light most favorable to the judgment of the trial court. *Fobar v. Vonderahe*, 771 N.E.2d 57, 59 (Ind.2002). "It is only when this evidence is without conflict, leading to but one conclusion, and the trial court reached a contrary conclusion, that we will reverse the decision as being contrary to law." *Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 247 (Ind.1992).

Initially, the Gills contend that Onyx did not follow the statutory requirements under Indiana Code § 32–28–3–3(a) by failing to provide evidence that Onyx filed a duplicate notice when it filed its Notice of Intention to Hold Mechanic's Lien with the County Recorder.[6] This argument fails because the evidence favorable to the judgment indicates that a duplicate notice was sent. Plaintiff's Exhibit 1 (admitted without objection) contains a recorder's certificate that states that the recorder "mailed first class a duplicate of this Sworn Statement and Notice of Intention to Hold Mechanic's Lien to the property owners named therein." Appellants' Appendix at 21. Because of the evidence that Onyx properly filed its mechanic's lien, we need not consider whether the Gills waived this argument.

■ Next, the Gills argue that they did not engage Onyx for the demolition work, but rather that Onyx was hired by Pollerts, and that the Gills did not provide the active consent needed to subject them to Onyx's mechanics lien.

■ A contractor may attach a mechanic's lien to real estate in order to recover his wages and costs. Ind.Code § 32–28–3–1 *et seq.* Before this lien may attach, however, "it is necessary that such materials should be furnished or labor performed by the authority and direction of the owner, and *something more than mere inactive consent* on the part of such owner is necessary in order that such lien may be

---

**6.** Indiana Code § 32–28–3–3(a) provides in relevant part that "a person who wishes to acquire a lien upon property ... must file in duplicate a sworn statement and notice of the person's intention to hold a lien upon the property for the amount of the claim."

acquired against him." *Woods v. Deckelbaum*, 244 Ind. 260, 264, 191 N.E.2d 101, 102 (1963) (*quoting Courtney v. Luce*, 101 Ind.App. 622, 626, 200 N.E. 501, 503 (1936)) (emphasis added). "The consent must be more than inactive or passive consent, and the lien claimant's burden to prove active consent is especially important when the improvements are requested by someone other than the landowner." *Cho v. Purdue Research Found.*, 803 N.E.2d 1161, 1168 (Ind.Ct.App.2004); *Stern & Son, Inc., v. Gary Joint Venture*, 530 N.E.2d 306, 308 (Ind.Ct.App.1988). Additionally, a court may consider "how closely the improvements in question resemble a directly bargained-for benefit." *Stern*, 530 N.E.2d at 309.

The distinction between active and inactive consent for mechanic's liens has been confronted in several cases. Sufficient active consent to subject an owner to foreclosure of a mechanics lien was found in *Mann v. Schnarr*, 228 Ind. 654, 669–70, 95 N.E.2d 138, 144 (1950) (owner not only knew of the work being done but also went to the contractor's office several times, received statements of the labor and materials furnished, objected to the high cost of the job, and signed several checks in partial payment for the job); *Better Homes Co. v. Hildebrand Hardware Co.*, 202 Ind. 6, 11, 171 N.E. 321, 322–23 (1930) (owner agreed to advance funds to complete a house under construction, actually advanced more funds than it had agreed to do, required that the contractor submit the plans and specifications for review, and made direct payments for the work and materials directly to the contractors); *O'Hara v. Architects Hartung & Assoc.*, 163 Ind.App. 661, 663, 326 N.E.2d 283, 285 (1975) (owners not only requested that the contractor be hired but also issued the initial payment check without objection to the proposed services and fee schedule). In contrast, conduct was found to be insufficient active consent to subject landowners to mechanic's liens in *Woods*, 244 Ind. at 266, 191 N.E.2d at 103 (owner knew repairs were being made, visited the premises, discussed paint color with workmen, but did not supervise the work); *Cho*, 803 N.E.2d at 1168–69 (owner reviewed plans and was aware of construction, but did not participate in negotiating construction contract); *Stern*, 530 N.E.2d at 308–09 (lease called for tenant to make improvements and owner was aware of the work, but its review of plans and onsite supervision was perfunctory and owner received no direct benefits); *Display Fixtures Co., Etc. v. R.L. Hatcher, Inc.*, 438 N.E.2d 26, 31 (Ind. Ct.App.1982) (owner saw installation of interior equipment by tenant's contractor and owner's contractor installed some paneling for tenant, but owner was rarely present during the work and did not discuss store interior with tenant).

Attempting to bring a degree of clarity to this question, our Court of Appeals has observed:

The exact nature and content of the owner's active consent in this context will vary from case to case; however, case law makes clear that the focus is not only on the degree of the owner's active participation in the decisions and the actual construction. Instead, the focus is also on how closely the improvements in question resemble a directly bargained-for-benefit.

*Stern*, 530 N.E.2d at 309, cited with approval in *Cho*, 803 N.E.2d at 1168.

The evidence is without any substantial conflict as to the following facts. The hotel fire began late Christmas Eve, 1998, and ended early on Christmas Day. Fatalities resulted. On Christmas morning Ralph Pardieck, president of Onyx, called his son Greg Pardieck, Onyx vice-president, to inform him of the fire and that "Fred Pollert had the insurance on it [the hotel]." Transcript at 17. Greg then

called Fred Pollert at his home, determined that Pollerts "had the insurance on it," and offered to provide Onyx's services to demolish the remnants of the hotel. Transcript at 18. On December 26, after being advised by the Fire Marshall that the remainder of the hotel structure needed to be demolished, Fred Pollert met with the Gills, and the Gills knew and were "comfortable" that Fred Pollert intended to call Onyx to do the demolition. Transcript at 62–63, 111. Fred Pollert testified that he called Onyx and "told them to go ahead and proceed." Transcript at 78. Onyx immediately moved in their equipment and commenced the demolition. Fred Pollert later testified that when he called Onyx about doing the demolition work, he emphasized to both Greg and Ralph Pardieck that "I couldn't guarantee them a dime because to my knowledge as of this point there was no insurance on the building." Transcript at 114. (At that time, it was uncertain whether the Gills had timely paid the insurance premium, but it was soon determined that timely payment was made.) Greg Pardieck testified that Onyx was hired by Pollert and expected to be paid by the insurance company, Penn–America. Transcript at 19, 21, 27, 29, 33, 34–36, 38, 40–41, 43. On December 30, 1998, Onyx wrote to GAB, stating: "Emergency Order to proceed by Mr. Fred Pollert of Pollert's Insurance given to Mr. Ralph Pardieck on Saturday, December 26, 1998 at 12:50 p.m. and Onyx moved equipment on site and commenced work." Plaintiff's Exhibit 2. By December 30, Greg Pardieck was told by both Fred Pollert and the insurance adjuster that the Gills' insurance policy provided demolition coverage only for 25%, or $62,500, of the $250,000 policy. Appellants' Appendix at 496, Transcript at 80–82, 118. Later in January, after an ice storm caused Onyx to pull its workers off the job, Fred Pollert

called Greg Pardieck and complained that the demolition had stopped. Expressing concern that bystanders could be injured, which could involve the insurance policy, Pollert directed Onyx to continue without stopping and assured Pardieck that Pollert would be paying for the work, that there was not a problem, and that "things would be taken care of." Transcript at 45–47. The Gills visited the demolition site occasionally during the work. When Onyx completed the demolition, it prepared its invoice and sent it to Pollert's office directed to both the Gills and Pollerts. The Gills did not discuss the demolition with Onyx, did not participate in the work, and did not agree to make any payments to Onyx. As to his alleged assurances to Onyx, Fred Pollert denied making any representations to Onyx that "insurance would pay the *entire* cost of the demolition work," or that Fred Pollert or Pollerts' Inc. "would personally pay whatever insurance didn't pay." *Id.* at 116 (emphasis added).

To support its claim that the Gills did more than inactively consent to Oynx's demolition of the hotel, Onyx points to trial evidence that the Gills asked Pollerts to get Onyx to do the work; that the Gills watched the work in progress and did not object; and that Brent Gill knew that Pollert called Onyx to make the arrangements. Brief of Appellee/Cross–Appellant Onyx at 5. The sole evidence cited by Onyx to establish that the Gills asked Pollerts to hire Onyx, however, is the testimony of Fred Pollert. *Id.*[7]

Viewing the facts in the light most favorable to the judgment, it is clear that there is insufficient proof that the Gills did authorize or direct Oynx's demolition services and that the Gills' conduct represented no more than inactive consent to the work. The Gills contend that they were

**7.** The citations in Onyx's brief all refer to the ⋅ testimony of Fred Pollert.

under the impression that the work was covered by their property insurance, they did not participate in any supervision of the work, they did not make any payments to Onyx, and the resulting demolition services did not constitute a benefit directly bargained-for by the Gills. The only evidence to the contrary came from Fred Pollert's testimony. Thus, Onyx argues that when Pollert requested Onyx to demolish the hotel, Pollert was acting as the agent of the Gills who are therefore responsible to pay for Oynx's services. As noted above, however, the sole evidence of any agency relationship between Pollerts and the Gills cited by Onyx is the testimony of Fred Pollert.

It has been long been held in Indiana that statements of an agent are not sufficient to establish an agency relationship. *Lester v. Hinkle*, 193 Ind. 605, 613, 141 N.E. 463, 466 (1923); *Blair–Baker Horse Co. v. First Nat'l. Bank of Columbus, Ind.*, 164 Ind. 77, 83, 72 N.E. 1027, 1029 (1905); *Commercial Union Assur. Co. v. State*, 113 Ind. 331, 337, 15 N.E. 518, 521 (1888); *Johnston Harvester Co. v. Bartley*, 81 Ind. 406, 408 (1882); *Storm v. Marsischke*, 159 Ind.App. 136, 139, 304 N.E.2d 840, 843 (1973); *Pan Am. World Airways, Inc. v. Local Readers Service, Inc.*, 143 Ind.App. 370, 373, 240 N.E.2d 552, 556 (1968); *Holland v. Farrier*, 75 Ind.App. 368, 373, 130 N.E. 823, 824 (1921); *W.T. Rawleigh Medical Co. v. Van Winkle*, 67 Ind.App. 24, 30–31, 118 N.E. 834, 836 (1918).

Onyx bases its entire claim of agency on the assertions of Pollert. However, "[o]nce the statements and representations [of the alleged agent] ... are removed, there remains nothing which establishes authority to enter into a contract." *Storm*, 159 Ind.App. at 140, 304 N.E.2d at 842–43. Thus there is no evidence to support Onyx's claim that Fred Pollert was acting as the Gills' agent when he engaged Onyx to demolish the Centennial Hotel remnants.

Because the evidence is without conflict and leads inescapably to but one reasonable conclusion that is contrary to the judgment foreclosing the mechanics lien, we must reverse.

**6. Monetary Judgment against Gills**

■ Onyx further argues that, in challenging the trial court judgment, the Gills' arguments are all directed to the mechanic's lien issue, and that the Gills "have not raised any arguments that the money judgment entered against them is incorrect." Brief of Appellee/Cross–Appellant Onyx at 6. Onyx urges that, even if the mechanic's lien is declared invalid, the monetary judgment should be affirmed. The Gills respond by arguing that there was no contract between Onyx and the Gills, and that Onyx was looking solely to be paid by Pollerts or the insurance company.

Onyx essentially admits the Gills' claim. At the time of the bench trial of Onyx's claims against Pollerts and the Gills, Onyx's opening statement declared that there were "two parts to this case ... a mechanics lien that we are foreclosing on and ... [t]he second issue ... whether or not Mr. Pollert is responsible for paying the bill that was done for the demolition of the hotel." Transcript at 3–4. Onyx did not then describe any claim for breach of contract against the Gills. At the close of evidence, rather than closing arguments, the trial court requested post-trial briefs.

In its initial post-trial brief Onyx clearly indicated that its claims for breach of contract and equitable estoppel were directed solely at Pollerts. Other than its request for foreclosure of its mechanics lien, Onyx's only claim against the Gills for monetary damages was based on its alternative claim that Pollert was acting as an agent of the Gills. Onyx opens the argu-

ment section of its post-trial brief as follows:

> Onyx believes that the evidence clearly demonstrates that [Pollerts] are responsible for paying the invoice. Two different legal theories support that conclusion: breach of contract and equitable estoppel. If [Pollerts] are not responsible because Pollert was acting as an agent of the Gills, then the Gills would be responsible for payment and the mechanic's lien should be foreclosed.

Appellee/Cross–Appellant's Supplemental Appendix at 3. The Onyx brief specifically presented argument as to three claims: breach of contract, equitable estoppel, and mechanic's lien. The first two sought relief only from Pollerts, and the last sought foreclosure of the lien against the Gills. In its concluding paragraph, after seeking monetary judgment against Pollerts, Onyx added: "If the court should find that Pollert was acting as agent for the Gills, then this court should enter judgment against Brent and Marina Gill in the amount of $143,800.00 ..." *Id.* at 5. In a subsequent post-trial reply brief, Onyx argued:

> Everyone, including Pollert, expected the insurance company to pay the demolition costs. Pollert sent the quote from Onyx and the final bill to the insurance company.... When Onyx stopped work temporarily, Pollert called and insisted that Onyx continue working on the project because the building was unsafe and created a liability hazard for which the insurance company would have to pay. At that time, he told Gregg Pardieck that Onyx would be paid, knowing that Gregg was expecting the insurance company to pay him. There was a meeting of the minds that Onyx would demolish the building and that the insurance company would pay for it.

Appellants' Appendix at 478–79. The Onyx post-trial reply brief also argued the theory of equitable estoppel, but not as

against the Gills. It urged that Onyx had relied on false statements of Fred Pollert and that "Pollert should now be estopped from claiming that he is not responsible for paying Onyx pursuant to the agreement he created with Onyx." *Id.* at 480. Finally, in its Appellee/Cross–Appellant's brief, Onyx states:

> Onyx believed and argued at trial that its contract was with Mr. Pollert and that Mr. Pollert should be responsible for payment based on principles of contract or estoppel. The trial court did not find Mr. Pollert responsible. The only way for the trial court to find that Mr. Pollert was not liable and that the Gills were liable is if Mr. Pollert was acting as the agent for the Gills and had authority to contract on their behalf. Because Mr. Pollert was acting as agent for the Gills when he assented to the work, the Gills are responsible for the agreements Mr. Pollert made on their behalf.

Brief of Appellee/Cross–Appellant at 5.

The trial court made no findings of fact supporting its judgment for Onyx against the Gills. At trial and on appeal, Onyx has asserted no claim for monetary damages against the Gills, except for its mechanic's lien claim and its theory that Pollerts was an agent of the Gills. Having found, *supra,* that there is insufficient evidence to support Onyx's mechanic's lien claim and its theory that Fred Pollert was acting as the Gills' agent, we conclude that the trial court's monetary judgment in favor of Onyx against the Gills is clearly erroneous, and we reverse.

### 7. Liability of Agent for Unauthorized Acts

 As against Pollerts, Onyx's Amended Complaint sought damages of $143,800, alleging that Pollerts authorized Onyx to do the demolition work pursuant to its quote of $153,800, that Pollerts impli-

edly promised that Onyx would be paid, that Onyx reasonably relied on the promise and completed the demolition, that Pollerts frequented the site during the demolition, and that Onyx received only $10,000, paid by Penn–America. Appellant's Appendix at 91–92. In a separate count entitled "Equitable Estoppel," Onyx alleged that Pollerts knowingly made false representations and concealed material facts, with the intention that Onyx would rely upon them, which it did, thereby suffering a loss of $143,800. *Id.* at 95.

In Onyx's cross-appeal challenging the judgment denying its claim against Pollerts, Onyx contends only that Pollerts "is responsible for the demolition costs up to the amount of coverage that Mr. Pollert represented." Br. of Appellee/Cross-Appellant Onyx at 6. Onyx argues that the undisputed evidence establishes that, at one point during the demolition, Pollert represented that there was $62,500 of insurance coverage for demolition, and that the trial court "erred in not returning a verdict against Pollerts' Inc. for at least $62,500.00 plus interest." *Id.* at 7, Appellants' Appendix at 496.

This Court has observed the "well recognized general rule, that where one person assumes to act as agent of another, but without authority to do so, he makes himself personally liable as a principal in the transaction." *Terwilliger v. Murphy,* 104 Ind. 32, 34, 3 N.E. 404, 406 (1885). *See Lewis v. Reed,* 11 Ind. 239, 242 (1858); *Pitman v. Kintner,* 5 Blackford 250, 252 (1839). This principle is generally recognized. The Restatement of Agency Second § 329 states:

A person who purports to make a contract, conveyance or representation on behalf of another who has full capacity but whom he has no power to bind, thereby becomes subject to liability to the other party thereto upon an implied warranty of authority, unless he has

manifested that he does not make such warranty or the other party knows that the agent is not so authorized.

Another expression of this general rule is expressed as follows:

Where the agent, without authority or in excess of his or her authority, contracts with a third person, who sues upon the implied warranty of authority, recovery is measured by real damages sustained by the breach of warranty. The agent may be held accountable for money paid or work or labor performed under the contract, or for special damages sustained by reason of the wrong in assuming to act without authority.

3 Am.Jur.2d 700–01, Agency § 334.

The evidence is undisputed that Fred Pollert, acting on behalf of Pollerts' Inc., purporting to be acting on behalf of Penn–America Insurance Company, engaged Onyx to commence demolition of the fire remnants of the Centennial Hotel. Pollerts thereafter expressly assured Onyx that the insurance provided coverage of $62,500, and later insisted that Onyx stay at work to complete the clean-up to minimize risk to the insurance company. While there is thus clear and undisputed evidence that Pollerts purported to act as an agent of another, the record is unclear whether he did so without authority. While the trial court had previously granted Penn–America and GAB summary judgment against Onyx upon its determination that "Fred Pollert individually and d/b/a Pollerts, Inc. was not a broker, special agent, or general agent for Penn–America Insurance Company and/or GAB Robins North America, Inc.," Appellants' Appendix at 170, said summary judgment was not sought or entered as against Pollerts, which is entitled to present evidence thereon at trial on remand.

## Conclusion

Transfer having previously been granted, we reverse the July 18, 2001, entry of summary judgment for Fred Pollert, Pollerts' Inc., and Penn–America Insurance Co. and against W. Brent and Marina Gill; we reverse the judgment foreclosing the mechanics lien of Onyx Paving Company, Inc., and awarding money damages and costs against W. Brent and Marina Gill; we reverse the judgment against Onyx and for Fred Pollert and Pollerts' Inc.; and we remand for further proceedings consistent with this opinion.

SHEPARD, C.J., and SULLIVAN, BOEHM, and RUCKER, JJ., concur.