**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

**FILED**

Aug 24 2012, 8:24 am

*[signature]*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**TERRY L. CORNELIUS**
Cornelius & Weingartner
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEES:

Attorney for CCJ Enterprises, LLC:
**JONATHAN H. NUSBAUM**
Beers Mallers Backs & Salin, LLP
Fort Wayne, Indiana

Attorneys for Salin Bank & Trust
Company:
**LARRY L. BARNARD**
**GRANT A. LISTON**
Carson Boxberger, LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MSKTD & ASSOCIATES, INC., | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 02A04-1202-PL-101 |
| | ) | |
| CCJ ENTERPRISES, LLC, JEFFREY | ) | |
| SASSMANNSHAUSEN, LORETTA | ) | |
| SASSMANNSHAUSEN, SALIN BANK | ) | |
| & TRUST COMPANY, | ) | |
| | ) | |
| Appellees-Defendants. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable David J. Avery, Judge
Cause No. 02D01-0909-PL-330

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Plaintiff/Counter-Defendant, MSKTD & Associates, Inc. (MSKTD) appeals the trial court's summary judgment in favor of Appellees-Defendants/Cross-Defendants, CCJ Enterprises, LLC (CCJ), Jeffrey Sassmannshausen, Loretta Sassmannshausen (Loretta), and Three Rivers Dermatology, LLC (TRD)(collectively, the CCJ Parties); and Appellee-Defendant/Cross-Plaintiff/Counter-Plaintiff, Salin Bank & Trust Company (Salin Bank).

We affirm.

## ISSUE

MSKTD raises two issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court erred in determining that MSKTD's mechanic's lien was not filed in a timely manner.

## FACTS AND PROCEDURAL HISTORY

TRD is an LLC whose sole member is Dr. Jeffrey Sassmannshausen (Dr. Sassmannshausen), a dermatologist. His wife Loretta is the Director of Operations. Prior to 2005, the Sassmannshausens planned to build a medical facility along with a spa (the Project). They consulted with International Design Concepts (IDC), an architectural firm out of the Seattle, Washington area focusing on medical and hotel spas. IDC advised the

Sassmannshausens on site selection and created preliminary design documents for the Project. IDC charged the Sassmannshausens $451,000 for its services and they paid all but $50,000.

In June 2004, the Sassmannshausens formed CCJ, an LLC, to acquire land on Coldwater Road in Fort Wayne, Indiana (the Property). On March 31, 2005, CCJ purchased the Property for $575,000, with a $57,500 cash down payment and additional financing from Salin Bank in the amount of $517,500. CCJ executed a promissory note in the amount of $517,500 to Salin Bank. That same day, CCJ granted Salin Bank a mortgage on the Property and all improvements and structures situated thereon. On April 5, 2005, the mortgage was recorded. The promissory note was renewed several times, with Salin Bank registering additional mortgages against the Property.

Following a few years' delay, the Sassmannshausens sought to go ahead with the Project. In May 2008, the Sassmannshausens met with several contractors, including Mark Hoeppner of Hoeppner Construction Corporation (Hoeppner). Hoeppner created a presentation for the Project, enlisting MSKTD to produce design sketches based on a smaller scale of IDC's earlier drawings. MSKTD provided Hoeppner with preliminary elevations, a rough floor plan, and cut sheets that detailed the interior finishing.

That same month, Hoeppner asked MSKTD to review its sketches to determine a projected cost for the Project. On May 12, 2008, one of MSKTD's principals informed Hoeppner that it estimated costs of $190 to $200 per square foot, assuming an unfinished basement and not including site and soft costs. The Sassmannshausens eventually

3

selected Hoeppner for the Project since his proposal was approximately $30 lower per square foot than the other contractors. Hoeppner later informed the Sassmannshausens that MSKTD would serve as architect for the Project.

MSKTD continued work on the design thereafter. Loretta met with MSKTD several times from June 2008 to September 2008. Loretta provided her input on the design and her expectations for the Project. She also made a number of requests to increase the scope of the Project. These included increases in the square footage for the first floor, the basement, and the parking lot. Her proposed modifications also included a ciborium, or open-domed structure at the building's entrance, which would result in an additional $97,000 in construction costs. On June 25, 2008, MSKTD sought Hoeppner's input on the increased scope of the Project. Hoeppner apparently had not known the specific cost but instructed MSKTD to "do whatever they tell you and we'll value engineer it at the end." (Appellant's App. p. 144). Loretta also requested that MSKTD's work be performed on a fast-track in order to get construction going as soon as possible.

On July 15, 2008, the Sassmannshausens and Hoeppner entered into a letter of intent (LOI) for the design and construction of the Project which was to be followed by a definitive design-build agreement based on form contracts issued by the American Institute of Architects. The LOI was non-binding except as to exclusivity and reimbursement of Hoeppner's "out of pocket expenses incurred in contemplation of the Project." (Appellant's App. p. 231). The LOI also described the Project as a one-story building with a first floor of 10,500 square feet and a basement of 7,000 square feet. The

4

parties' initial budget for the Project was, subject to the final design plans, $135-$140 per square foot. Based on this budget, the Sassmannshausens sought financing from Salin Bank in the amount of $2.8 million. Although Hoeppner's attorney prepared a design-build contract, the Sassmannshausens failed to sign the contract.

On July 15, 2008, MSKTD issued its first of four invoices to Hoeppner for its services. On July 17, 2008, MSKTD prepared a contract between itself and Hoeppner. The contract recited parameters for a building of approximately 19,000 square feet at a cost of nearly $160 per square foot. Hoeppner did not sign the contract and apparently never paid MSKTD's invoices.

In September 2008, MSKTD provided completed design documents to the Sassmannshausens, who took them to Salin Bank. Salin Bank informed the Sassmannshausens that its appraiser determined that the Project's cost would exceed $2.8 million and that it refused to finance any amount in excess. Thereafter, Loretta had meetings with MSKTD and Hoeppner to cut down the plans and thereby reduce project costs to meet the $2.8 million budget.

In October or November 2008, Hoeppner went out of business. In a letter dated November 14, 2008, MSKTD informed Loretta that Hoeppner had gone out of business and offered to take over as design-builder for the Project. MSKTD met with Loretta in November 2008 and December 2008 to provide value engineering services, *i.e.*, modification of the design to lower construction costs without departing from the overall design concept. MSKTD invoiced CCJ directly for its value engineering services in the

amount of $3,796. While MSKTD had never invoiced CCJ previously, the Sassmannshausens or CCJ paid this bill.

In a letter dated January 5, 2009, the Sassmannshausens informed MSKTD that they were not going ahead with the Project. The Sassmannshausens then took IDC and MSKTD's plans to another design-builder and received designs allowing them to complete the Project within the $2.8 million budget. However, Salin Bank withdrew from the Project as a result of the financial industry collapse.

On February 24, 2009, MSKTD recorded its Sworn Statement of Intention to Hold a Lien against the Property, identifying CCJ as the owner. On September 3, 2009, MSKTD filed a four-Count Complaint against CCJ, the Sassmannshausens, and Salin Bank. The Complaint sought to foreclose on MSKTD's mechanic's lien and alleged that the Sassmannshausens and CCJ were liable for MSKTD's architectural fees for the Project. Count IV alleged that MSKTD was a third party beneficiary to the LOI between Hoeppner and the Sassmannshausens. On October 14, 2009, Salin Bank filed its Answer along with a Cross-Complaint against CCJ and the Sassmannshausens and its Counterclaim against MSKTD. On November 20, 2009, CCJ and the Sassmannshausens filed their Answer and Counterclaim against MSKTD.

On May 26, 2011, Salin Bank filed its motion for partial summary judgment on the priority of its mortgages over MSKTD's mechanic's lien. On June 7, 2011, MSKTD amended its Complaint to add TRD as a defendant. On July 25, 2011, MSKTD filed its motion for partial summary judgment to foreclose on its lien and to determine that its

mechanic's lien had priority over Salin Bank's encumbrances on the Property. On July 26, 2011, the CCJ Parties filed their motion for summary judgment. In addition to challenging their liability to MSKTD, the CCJ Parties contested the validity of MSKTD's mechanic's lien and the timeliness of its filing.

On December 2, 2011, the trial court ruled on the parties' motions for summary judgment. First, the trial court determined that MSKTD had untimely filed its mechanic's lien. As a result, the trial court denied MSKTD's motion for partial summary judgment; granted the CCJ Parties' motion for summary judgment in part; and granted Salin Bank's partial motion for summary judgment, in the latter case entering judgment for Salin Bank. Further, the trial court granted summary judgment in favor of the CCJ Parties on MSKTD's claims for damages as a third-party beneficiary to the LOI between the Sassmannshausens and Hoeppner. However, the trial court denied summary judgment for the CCJ Parties on the issue of the Sassmannshausens' personal liability to MSKTD and whether MSKTD was entitled to recovery under *quantum meruit* for its architectural services.

MSKTD now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

I. *Standard of Review*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). A fact is material if its resolution would affect the outcome of the case. *Williams v. Tharp*, 914

7

N.E.2d 756, 761 (Ind. 2009). An issue is genuine if a trier of fact is required to resolve the parties' differing accounts of the truth or if the undisputed facts support conflicting reasonable inferences. *Id.*

In reviewing a decision upon a summary judgment motion, we apply the same standard as the trial court. *Cho v. Purdue Research Foundation*, 803 N.E.2d 1161, 1167 (Ind. Ct. App. 2004). We do not reweigh the evidence designated by the parties. *Id.* Instead, we liberally construe the evidence in the light most favorable to the non-moving party. *Id.* The moving party bears the burden of showing *prima facie* that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Id.* Once this burden has been met, the non-moving party must respond by setting forth specific facts demonstrating a genuine need for a trial, and cannot rest upon the allegations or denials in the pleadings. *Id.* We review only the designated evidentiary material in the record, construing that evidence liberally in favor of the non-moving party, so as not to deny that party its day in court. *Id.*

The trial court entered findings of fact and conclusions thereon in support of its judgment. Special findings are not required in summary judgment proceedings and are not binding on appeal. *Id.* However, such findings offer this court valuable insight into the trial court's rationale and facilitate appellate review. *Id.* Where, as here, the parties have made cross-motions for summary judgment, our standard of review is the same; we consider each motion separately to determine whether the moving parties are entitled to judgment as a matter of law. *Myers v. Coats*, 966 N.E.2d 652, 656-57 (Ind. Ct. App.

8

2011). On appeal, we can affirm summary judgment under any theory supported by the designated evidence. *Branham v. Celadon Trucking Services, Inc.*, 744 N.E.2d 514, 521 (Ind. Ct. App. 2001), *trans. denied*.

## II. *Analysis*

### A. *Mechanic's Lien*

Indiana's mechanic's lien statute is found at Ind. Code § 32-28-3-1, *et seq*. Mechanic's liens provide a mechanism for contractors who have not been paid to seek payment from construction project owners by attaching a lien to real estate. *See Gill v. Pollert*, 810 N.E.2d 1050, 1058 (Ind. 2004). MSKTD is an architectural firm. Under I.C. § 32-28-11-1 "registered architects" may secure and enforce mechanic's liens under I.C. ch. 32-28-3.

Mechanic's liens were unknown at common law and are purely creatures of statute. *Cho*, 803 N.E.2d at 1167. As a consequence, mechanic's liens can only exist when the claimant has complied with the applicable statutory steps. *Id*. The courts generally have strictly construed the requirements for creating a lien, while liberally applying the remedial aspects of the mechanic's lien statutes. *Id*.

Under I.C. § 32-28-3-3, a person who wishes to acquire a mechanic's lien must file a sworn statement and notice of the person's intention to hold a lien. In addition to providing details on the amount claimed and the identities of the claimant, owner, and land, the filing must occur within certain deadlines. *See* I.C. § 32-28-3-3(a-c). The

9

relevant time frame in this case is set forth in I.C. § 32-28-3-3(a), which provides that liens against commercial property be filed within 90 days of completion of the work.

B. *Timely Filing*

Although the trial court's December 2, 2011 summary judgment adjudicated three issues contained in the parties' various motions for summary judgment, here MSKTD appeals, and the parties' arguments address, only that part of the judgment pertaining to the timely filing and validity of MSKTD's mechanic's lien.

The trial court concluded that MSKTD's mechanic's lien was not timely filed because the lien was based on MSKTD's work done under the design-build arrangement with Hoeppner, which concluded on or before November 14, 2008. The deadline for filing a mechanic's lien under this contract was February 12, 2009 and MSKTD did not file its sworn statement of intent to hold a lien until February 24, 2009. On appeal, MSKTD argues that its work for the Sassmannshausens was a continuation of its work for Hoeppner. Thus, it argues that the trial court should have instead measured its time limit to file a mechanic's lien from the date its work for the Sassmannshausens ended, December 8, 2008.

In support of its determination, the trial court relied on *Kendallville Lumber Co. v. Adams*, 176 N.E. 555 (Ind. Ct. App. 1931). In *Kendallville Lumber*, a lumber company sought to foreclose on a mechanic's lien for building materials it had furnished separately to a contractor and to a homeowner, albeit for the same residential construction project. *Id*. at 556. Kendallville Lumber supplied the contractor with building materials for

nearly six months before the contractor became insolvent and abandoned the project. *Id.* Thereafter, the homeowner, Adams, completed construction, but had notified Kendallville Lumber that no more materials were to be furnished to the contractor and all further materials for the project would be paid for by Adams. *Id.* On appeal, this court affirmed the trial court's finding that the evidence established that Kendallville Lumber had furnished building materials for the project under two separate contracts, one with the contractor and one with Adams. *Id.* at 557. However, because Kendallville Lumber waited too long to file its mechanic's lien after it last provided materials under its agreement with the contractor, the lien was invalid as to claims arising under the first contract as Kendallville Lumber could not tack on its claim for materials furnished under the first contract to its claim for materials furnished under the second contract. *Id.* at 558.

Indiana decisions following *Kendallville Lumber* reached the same conclusion. In *Wavetek Indiana, Inc. v. K.H. Gatewood Steel Co., Inc.*, 458 N.E.2d 265, (Ind. Ct. App. 1984), we concluded that a subcontractor had not timely filed its mechanic's lien for work done under two contracts with the same contractor. We recited the general rule as:

> where labor or materials are furnished under separate contracts, even though the contracts are between the same persons, and relate to the same building or improvement, the contracts cannot be tacked together to enlarge the time for filing a lien for what was done or furnished under either, but a lien must be filed for what was done under each contract within the statutory period after its completion.

*Id.* at 268.

Here, the trial court found that there was no genuine issue of material fact that MSKTD furnished its architectural services under separate contracts with Hoeppner and

11

the Sassmannshausens. Under the design-build contractual arrangement for the Project, Hoeppner procured the services of subcontractors, including MSKTD, for the Project. The designated evidence shows that MSKTD rendered architectural services to Hoeppner from May 5, 2008 until Hoeppner went out of business on or before November 14, 2008. These services included preparation of preliminary design documents, client meetings, and preparation of final design documents. Beginning July 15, 2008, MSKTD rendered four invoices to Hoeppner, which were not paid. However, MSKTD did not approach the CCJ Parties for payment of these four invoices.

As design-builder for the Project, directions as to Project cost came through Hoeppner, who was selected by the Sassmannshausens based on his estimate of $2.8 million. However, MSKTD's final design required a budget of over $4.1 million. After Salin Bank refused to provide financing in excess of $2.8 million in September 2008, Loretta met with MSKTD and Hoeppner to reduce the Project costs by revising the building's exterior. Yet, by their own admission, MSKTD did not engage in value engineering at that time.

After Hoeppner went out of business, MSKTD informed Loretta accordingly and offered to take over for Hoeppner as design-builder. MSKTD met with Loretta on two occasions, November 19, 2008 and December 8, 2008, and rendered value engineering services. More importantly, both principals of MSKTD testified that they did not provide value engineering services until after Hoeppner dropped out. The extent of cost reduction achieved through value engineering was apparently $1 million. MSKTD billed TRD

12

$3,659 for such services and it is undisputed that this bill was paid. As a result, we agree with the trial court there is no genuine issue of material fact that MSKTD's value engineering services for the Sassmannshausens were rendered separately from and not pursuant to MSKTD's contract with Hoeppner.

Nonetheless, MSKTD argues that there was only one contract, "which included the initial design and the value engineering to bring the design down to the available financing." (Appellant's Reply Br. p. 4). MSKTD relies on *Miller Monuments, Inc. v. Asbestos Insulating and Roofing Company*, 185 N.E.2d 533 (Ind. Ct. App. 1962). However, this case is distinguishable from the matter before us. In *Miller Monuments*, the project owner refused to pay for corrective work rendered by a subcontractor. *Id.* at 534. The subcontractor later performed additional work to meet the project owner's objections and filed a mechanic's lien for its unpaid services. *Id.* In determining that the subcontractor's mechanic's lien was timely filed, albeit past the sixty day time limit, this court found it determinative that the additional work was 1) to correct a problem with the work originally contemplated under the contract; and 2) not performed gratuitously or under a new contract to make repairs or perform services that were contemplated under the original contract. *Id.* at 535.

In essence, by asserting that its services rendered directly to the Sassmannshausens were a continuation of the services rendered to Hoeppner, MSKTD attempts to tack on work performed through Hoeppner under the design-build arrangement to its work performed directly for the Sassmannshausens. However, despite MSKTD's assertions

13

that value engineering was called for under its agreement with Hoeppner and that its work with Loretta represented continuing work with the intention of completing the job, by its own admission, value engineering was not undertaken until after its agreement with Hoeppner expired. Consequently, MSKTD's reliance on *Miller Monuments* is unavailing.

We find that the trial court correctly determined that MSKTD's mechanic's lien was invalid because it was not timely filed. Accordingly, the trial court did not err in denying MSKTD's motion for partial summary judgment and granting both Salin Bank and the CCJ Parties' summary judgment.[1]

### CONCLUSION

Based on the foregoing, we conclude that the trial court properly denied MSKTD's motion for partial summary judgment. We therefore affirm the trial court's grant of summary judgment in favor of CCJ Parties and Salin Bank as to this issue as well as the trial court's judgment for Salin Bank on their Counterclaim against MSKTD.

Affirmed.

NAJAM, J. and DARDEN, S. J. concur

---

[1] Based on our conclusion that MSKTD's mechanic's lien was not timely filed, we need not address Salin Bank's claim that its encumbrances on the Property have priority.